Slip Op. 14 - 57

UNITED STATES COURT OF INTERNATIONAL TRADE

<table>
<tr><td>

AD HOC SHRIMP TRADE ACTION
COMMITTEE,

      Plaintiff,

        v.

UNITED STATES,

      Defendant.

</td><td>

**PUBLIC VERSION**

Before: Donald C. Pogue,
        Chief Judge

Court No. 12-00290[1]

</td></tr>
</table>

<u>OPINION</u>

[affirming the Department of Commerce's final results of
antidumping duty administrative review]

Dated: May 27, 2014

     <u>Andrew W. Kentz</u>, <u>Jordan C. Kahn</u>, <u>Nathaniel Maandig
Rickard</u>, and <u>Nathan W. Cunningham</u>, Picard Kentz & Rowe LLP, of
Washington, DC, for the Plaintiff.

     <u>Joshua E. Kurland</u>, Trial Attorney, Commercial
Litigation Branch, Civil Division, U.S. Department of Justice,
of Washington, DC, for the Defendant.  Also on the brief were
<u>Stuart F. Delery</u>, Assistant Attorney General, <u>Jeanne E.
Davidson</u>, Director, and <u>Patricia M. McCarthy</u>, Assistant
Director.  Of counsel on the brief was <u>Melissa M. Brewer</u>,
Attorney, Office of the Chief Counsel for Trade Enforcement and
Compliance, U.S. Department of Commerce, of Washington, DC.

     **Pogue, Chief Judge:**  This action arises from the sixth

administrative review by the United States Department of

Commerce ("Commerce") of the antidumping duty order on certain

---

[1] This case was previously consolidated with <u>Hilltop Int'l v.
United States</u>, Ct. No. 12-00289, <u>see</u> Order Dec. 11, 2012,
ECF No. 18, but has subsequently been severed therefrom.
<u>See</u> Order Apr. 23, 2014, ECF No. 19.

frozen warmwater shrimp from the People's Republic of China

("PRC" or "China").[2]  Plaintiff Ad Hoc Shrimp Trade Action

Committee ("AHSTAC") – an association of domestic warmwater

shrimp producers that participated in this review[3] – challenges

Commerce's determinations to I) limit its examination to two

mandatory respondents; II) rely exclusively on certain entry

data obtained from United States Customs and Border Protection

("CBP") to make relative sales volume determinations when

selecting respondents for individual review; and III) use data

from a single surrogate country to value the labor factor of

production when calculating normal values.[4]

    The court has jurisdiction pursuant to

Section 516A(a)(2)(B)(iii) of the Tariff Act of 1930, as

amended, 19 U.S.C. § 1516a(a)(2)(B)(iii) (2006),[5] and 28 U.S.C.

---

[2] See Certain Frozen Warmwater Shrimp from the People's Republic of China, 77 Fed. Reg. 53,856 (Dep't Commerce Sept. 4, 2012) (final results, partial rescission of sixth antidumping duty administrative review and determination not to revoke in part) ("Final Results") and accompanying Issues & Decision Mem., A-570-893, ARP 10-11 (Aug. 27, 2012) ("I & D Mem.").

[3] Compl., ECF No. 2, at ¶ 7.

[4] See Mem. of L. in Supp. of [AHSTAC]'s Mot. for J. on the Agency R., Ct. No. 12-00289, ECF No. 31 ("AHSTAC's Br."). A public version of ASHTAC's (confidential) brief is available at ECF No. 32.

[5] Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code, 2006 edition.

§ 1581(c) (2006).

As explained below, Commerce's determinations to limit
its examination of respondents pursuant to 19 U.S.C.
§ 1677f-1(c)(2)(B); rely on Type 03 CBP data to make relative
sales volume determinations when selecting respondents for
individual examination; and value surrogate wage rates using
data from the chosen primary surrogate country are each
affirmed.

## STANDARD OF REVIEW

The court upholds Commerce's antidumping
determinations if they are in accordance with law and supported
by substantial evidence. 19 U.S.C. § 1516a(b)(1)(B)(i).  Where,
as here, the antidumping statute does not directly address the
question before the agency, the court will defer to Commerce's
construction of its authority if it is reasonable. Timken Co. v.
United States, 354 F.3d 1334, 1342 (Fed. Cir. 2004) (relying on
Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc., 467 U.S.
837, 842-43 (1984)).

Substantial evidence is "such relevant evidence as a
reasonable mind might accept as adequate to support a
conclusion," Consol. Edison Co. of N.Y. v. NLRB, 305 U.S. 197,
229 (1938), and "can be translated roughly to mean 'is [the
determination] unreasonable?'" Nippon Steel Corp. v. United

States, 458 F.3d 1345, 1351 (Fed. Cir. 2006) (citation omitted,

alteration in the original).

**DISCUSSION**

I.   Commerce's Determination to Limit Individual Examination to
     Two Mandatory Respondents

          AHSTAC's challenge to Commerce's determination to

limit its examination to two mandatory respondents, AHSTAC's Br.

at 30-35, is rooted in Commerce's statutory obligation to

"determine the individual weighted average dumping margin for

each known exporter and producer of the subject merchandise"

when conducting administrative reviews of antidumping duty

orders. 19 U.S.C. § 1677f-1(c)(1).  But the statute also permits

Commerce to limit its examination if the review "involve[s]" a

"large number of exporters or producers." Id. at § 1677f-1(c)(2)

(the "large number exception").  Pursuant to the large number

exception, Commerce may limit its examination to, *inter alia*,

"exporters and producers accounting for the largest volume of

the subject merchandise from the exporting country that can be

reasonably examined." Id. at § 1677f-1(c)(2)(B).[6]

_____

[6] Those respondents who are not selected for individual
examination and do not demonstrate eligibility for a separate
rate are assigned the countrywide rate. See Transcom, Inc. v.
United States, 294 F.3d 1371, 1373 (Fed. Cir. 2002) (discussing
Commerce's practice of assigning to all exporters from non-
market economy ("NME") countries like China a countrywide
antidumping duty rate unless they affirmatively demonstrate
                                        (footnote continued)

AHSTAC contends that Commerce improperly invoked the large number exception here because the number of exporters or producers "involved" in this review was not a "large number." AHSTAC's Br. at 32-35. Although the review was initiated for 84 producers or exporters,[7] AHSTAC asserts that the number of respondents "involved" in the review should be determined based on CBP import data, which AHSTAC contends show that significantly fewer than 84 producers or exporters exported subject merchandise to the United States during the period of

---

eligibility for a "separate rate"). Those respondents who do demonstrate separate rate eligibility are assigned the "all others" rate. Yangzhou Bestpak Gifts & Crafts Co. v. United States, 716 F.3d 1370, 1374 (Fed. Cir. 2013) ("The separate rate for eligible non-mandatory respondents is generally calculated following the statutory method for determining the 'all others rate' under [19 U.S.C.] § 1673d(c)(5)(A). As such, Commerce will typically use the weighted average of all mandatory respondents' rates, excluding any de minimis and AFA rates [i.e., rates calculated using adverse inferences employed based on a finding of failure to cooperate, see 19 U.S.C. § 1677e(b)]. If all dumping margins established are only de minimis or AFA rates, Commerce accordingly applies the exception found in § 1673d(c)(5)(B) [permitting Commerce to 'use any reasonable method to establish the estimated all-others rate for exporters and producers not individually investigated'].") (additional citations omitted).

[7] Initiation of Antidumping Duty Administrative Reviews, Requests for Revocation in Part, and Deferral of Administrative Review, 76 Fed. Reg. 17,825, 17,827-28 (Dep't Commerce Mar. 31, 2011) ("Initiation Notice") (listing 84 companies as covered by the 2010-11 review of the antidumping duty order on certain frozen warmwater shrimp from the PRC).

review ("POR"). AHSTAC's Br. at 33-35.[8]  Commerce, on the other

hand, maintains that the number of producers or exporters

"involved" in the review is the number for which review was

initiated and not subsequently rescinded. See I & D Mem. cmt. 8

at 41.[9]

         The first question before the court, therefore, is the

meaning of the phrase "involved in the . . . review." 19 U.S.C.

§ 1677f-1(c)(2).  Because the statute itself does not

unambiguously define this contested term,[10] Commerce's

construction is entitled to deference if it is reasonable.

See Chevron, 467 U.S. at 842-43.

         Commerce submits that each producer or exporter for

whom review is initiated and not subsequently rescinded is

involved in the review. See I & D Mem. cmt. 8 at 41.  This

---

[8] See also id. at 18 ("The Type 03 CBP data that Commerce used to
select respondents [for individual examination] reflected [[ ]]
exporters of subject merchandise during the POR.").

[9] See also Def.'s Resp. in Opp'n to Pls.' Mots. for J. Upon the
Agency R., Ct. No. 12-00289, ECF No. 50 ("Def.'s Br.").
See supra note 1 regarding this action's prior consolidation
history.  A public version of Defendant's (confidential) brief
is available at ECF No. 51.

[10] See, e.g., Carpenter Tech. Corp. v. United States, 33 CIT
1721, 1727-28, 662 F. Supp. 2d 1337, 1342 (2009) (noting that
"Congress did not define the term 'large number of exporters or
producers involved in the . . . review,' as used in 19 U.S.C.
§ 1677f-1(c)(2)" and opining that "the term might be seen as
inherently ambiguous in some contexts").

construction is consistent with the statute's Statement of

Administrative Action ("SAA"),[11] which affirms that § 1677f-1(c)

codified Commerce's preexisting practice of "attempt[ing] to

calculate individual dumping margins for all producers and

exporters . . . *for whom an administrative review is requested*."

H.R. Doc. 103-316, at 872 (1994), reprinted in 1994 U.S.C.C.A.N.

4040, 4200 (emphasis added).  Thus the SAA supports Commerce's

reading that the phrase "each known exporter and producer of the

subject merchandise," to which the phrase "exporters or

producers involved in the . . . review" refers, see 19 U.S.C.

§ 1677f-1(c), contemplates the entities for whom review was

requested, initiated, and not rescinded, and does not require

Commerce to first evaluate whether or to what extent those

entities shipped subject merchandise during the POR.

      AHSTAC essentially suggests that Commerce should have

rescinded its review — and thus discharged its duty to assign

dumping margins — with respect to all those respondents for whom

review was requested and initiated but who AHSTAC maintains

(based on its reading of the CBP data) had no exports of subject

---

[11] See 19 U.S.C. § 3512(d) ("The statement of administrative
action approved by the Congress . . . shall be regarded as an
authoritative expression by the United States concerning the
interpretation and application of the Uruguay Round Agreements
and this Act in any judicial proceeding in which a question
arises concerning such interpretation or application.").

merchandise during the POR.[12]  But Commerce's consistent and

judicially-affirmed practice has been that CBP data alone are

insufficient to compel rescission based on a finding of no

shipments.[13]

Indeed the procedure for rescinding a review based on

a finding of no shipments reveals that all producers or

exporters for whom review was initiated are "involved" in the

review – demanding the use of Commerce's resources – until

rescission is in effect.  As Commerce has previously stated:

> [P]rior to rescinding a review pursuant to 19 C.F.R.
> [§] 351.213(d)(3), [Commerce] must begin a factual
> examination and engage[] its resources to make [the]
> factual finding [as to whether or not the producers or

---

[12] See AHSTAC's Br. at 33-34; see also 19 C.F.R. § 351.213(d)(3)
(permitting Commerce to rescind review of producers or exporters
who had no exports, sales, or entries of subject merchandise
during the POR).

[13] See, e.g., Fresh Garlic from the People's Republic of China,
Issues & Decision Mem., A-570-831, ARP 07-08 (June 14, 2010)
(adopted in 75 Fed. Reg. 34,976 (Dep't Commerce June 21, 2010)
(final results and partial rescission of the 14th antidumping
duty administrative review)) ("Garlic from China I & D Mem.")
cmt. 2 at 8-9 ("CBP data is not sufficiently comprehensive to
serve as a reliable basis for a conclusive determination that a
particular producer or exporter made no shipments or entries of
subject merchandise during the POR."); Hyosung Corp. v. United
States, Slip Op. 11-34, 2011 WL 1882519, at *5 (CIT Mar. 31,
2011) ("Commerce is not obligated to rescind the review, but it
*may* if it determines that a particular company did not have
entries, exports, or sales. . . . [A]s Commerce explained,
[however,] CBP data alone is not a conclusive statement of
whether a respondent had shipments because it does not capture
all entries, such as those not made electronically.") (emphasis
in original).

exporters in question had shipments of subject
merchandise during the POR].  In some cases, there is
little controversy over the facts (i.e., the company
has filed a timely no-shipment certification, the CBP
data indicates no shipments, any response from CBP to
[Commerce]'s no shipments inquiry does not contain any
contrary evidence of possible shipments, and no other
party presents other information).  In other cases,
the evidence may be less clear and may require
[Commerce] to issue supplemental questionnaires, do
further research into CBP data, allow time for parties
to comment and submit further information, and
ultimately consider and weigh potentially conflicting
data and, where necessary and appropriate, scheduling
and conducting verification of the respondent's claims
of no shipments.

Garlic from China I & D Mem. cmt. 2 at 7 (citation omitted).

Commerce's reading of the word "involved" in § 1677f-1(c) is

thus further supported by the agency's judicially-affirmed

practice of not rescinding reviews based on CBP data alone.[14]

Accordingly, Commerce's reading of the statute – that

the number of exporters or producers "involved" in a review, as

contemplated by the exception contained in 19 U.S.C.

§ 1677f-1(c)(2), is the number for whom review was initiated and

not subsequently rescinded – is sustained as reasonable.[15]

---

[14] See supra note 13.

[15] AHSTAC also makes an argument rooted essentially in the
doctrine of judicial estoppel. See ASHTAC's Br. at 33 ("Commerce
released the CBP data at the outset of the review and
consistently maintained that they accurately reflect import
volumes during the POR.  Commerce should not be able to benefit
from the administrative convenience afforded by these data while
simultaneously using the number of respondents on which review
has been requested as the relevant figure in evaluating whether
                                        (footnote continued)

Here, the number of exporters or producers "involved" in the review at the time that Commerce invoked the large number exception – i.e., the number of exporters or producers for whom review was initiated and not rescinded – was 83.[16]  AHSTAC does not contest that 83 is a sufficiently large number to invoke the large number exception. See AHSTAC's Br. at 30-35 (arguing only that the number of respondents allegedly shown in the CBP data to have exported subject merchandise during the POR is not a large number).  Because 83 is, non-controversially, a large

---

to limit is examination.") (citations omitted).  It is true that, "absent any good explanation, a party should not be allowed to gain an advantage by litigation on one theory, and then seek an inconsistent advantage by pursuing an incompatible theory." New Hampshire v. Maine, 532 U.S. 742, 749 (2001) (internal quotation marks and citation omitted).  But this is not such a case.  Commerce is not attempting to gain unfair advantage from inconsistent positions – its position that CBP data present reliable information regarding relative sales volumes is not inconsistent with its position that every exporter and producer for whom review is requested is involved in the review unless and until the review is specifically rescinded following the proper procedures therefor.

[16] See Initiation Notice, 76 Fed. Reg. at 17,827-28 (listing 84 companies as covered by the 2010-11 review of the antidumping duty order on certain frozen warmwater shrimp from the PRC); Certain Frozen Warmwater Shrimp form the People's Republic of China, 77 Fed. Reg. 12,801, 12,803 (Dep't Commerce Mar. 2, 2012) (preliminary results, partial rescission, extension of time limits for the final results, and intent to revoke, in part, of the sixth antidumping duty administrative review) ("Preliminary Results") (rescinding the review with respect to an entity that filed a "certification indicating that it did not export subject merchandise to the United States during the POR," regarding which Commerce's inquiry to CBP and request for comments from interested parties yielded no contrary information).

number, Commerce properly invoked § 1677f-1(c)(2) in this
review.

II.   Commerce's Exclusive Reliance on Type 03 CBP Data to Make
      Relative Sales Volume Determinations

        AHSTAC's next claim also proceeds from the statutory

provision, noted above, that permits Commerce to limit its

examination to, *inter alia*, "exporters and producers accounting

for the largest volume of the subject merchandise from the

exporting country that can be reasonably examined," if the

number of respondents involved in an antidumping review is so

large as to make individual examination of all respondents not

practicable. 19 U.S.C. § 1677f-1(c)(2)(B).  Here, Commerce

determined to limit its examination to the two largest

exporters. I & D Mem. cmt. 8 at 40-41 (relying on 19 U.S.C.

§ 1677f-1(c)(2)(B)).  As Commerce explained, "the CBP data

demonstrates that [the two chosen mandatory respondents] account

for the overwhelming majority of the total reported quantity of

imports of subject merchandise to the United States during the

POR,"[17] and "it would be an unnecessary allocation of

[Commerce]'s limited resources to individually examine the

---

[17] Id. at 41 (citing Certain Frozen Warmwater Shrimp from the
[PRC], Resp't Selection Mem., A-570-893, ARP 10-11 (May 9, 2011)
("Resp't Selection Mem.") at Attach. 1, reproduced in App. of
Docs. Supporting [Def.'s Br.] ("Def.'s App."), Ct. No. 12-00289,
ECF No. 58-1, at Tab 5).

remaining quantity as it is extremely small."[18]  AHSTAC contends

that Commerce's determination regarding which respondents

exported the largest volume of subject merchandise during the

POR was not supported by substantial evidence. AHSTAC's Br.

at 19-30.

> A.   *The Regal Discrepancy*

First, AHSTAC relies on a discrepancy between the

volume of sales reported for respondent Zhanjiang Regal

Integrated Marine Resources Company Limited ("Regal") in the CBP

data used to rank respondents' relative export volumes and the

data reported by Regal itself in response to Commerce's inquiry.

AHSTAC's Br. at 23; see also Def.'s Br. at 4 ("Commerce noted a

15 to 18 percent discrepancy between the volume of exports

reported for Regal in the Type 03 CBP data and the greater

volume of exports Regal reported in its questionnaire

responses.") (citation omitted).[19]  AHSTAC contends that this

---

[18] Id. (citing Torrington Co. v. United States, 68 F.3d 1347,
1351 (1995)).

[19] Entries are designated by the importer, under penalty of the
law for fraud and/or negligence, 19 U.S.C. § 1592, with a
two-digit code. See U.S. Customs & Border Prot., Dep't of
Homeland Sec., CBP Form 7501 Instructions 1 (July 24, 2012),
available at http://forms.cbp.gov/pdf/7501_instructions.pdf
(last visited Apr. 28, 2014). "The first digit of the code
identifies the general category of the entry (i.e., consumption
= 0, informal = 1, warehouse = 2).  The second digit further
defines the specific processing type within the entry category."
Id.  Consumption entries covered by an antidumping duty order
                                          (footnote continued)

discrepancy (the "Regal discrepancy") demonstrates that the CBP data on which Commerce's relative sales volume determinations were based are unreliable, and therefore provide insufficient evidentiary support for Commerce's conclusion that the chosen mandatory respondents accounted for the largest sales volumes of subject merchandise relative to the remaining respondents. See AHSTAC's Br. at 24.

Commerce may base its § 1677f-1(c)(2)(B) relative sales volume determinations on Type 03 CBP data[20] in the absence of evidence indicating that such data are inaccurate or otherwise unreliable. See Pakfood Pub. Co. v. United States,

---

must be designated as Type 03, whereas consumption entries that are free and dutiable are designated as Type 01. Id. AHSTAC suggests that Type 03 CBP data were unreliable in this case because some unknown portion of subject merchandise may have been incorrectly entered as Type 01. See AHSTAC's Br. at 23-27.

[20] AHSTAC argues that Commerce should be required to also consider and release to the parties under protective order Type 01 data. See AHSTAC's Br. at 26-27; see generally supra note 19.  But Type 01 data, whether alone or in conjunction with Type 03 data, do not provide information that could lead Commerce to easily identify any Type 01 entries as subject merchandise. See Ad Hoc Shrimp Trade Action Comm. v. United States, __ CIT __, 828 F. Supp. 2d 1345, 1355 (2012) ("The classification [as Type 01 or 03] itself does not yield any specific information that would assist [Commerce] in expeditiously determining whether merchandise should have been reported as Type 03, or making any modifications to the Type 03 data for purposes of respondent selection.") (internal quotation marks, citation, and footnote omitted).

__ CIT __, 753 F. Supp. 2d 1334, 1345-46 (2011).[21]  Where the

record presents evidence that rebuts the presumption that CBP

has assured the accuracy of such data, Commerce must account for

such evidence when making its relative sales volume

determinations. Ad Hoc Shrimp Trade Action Comm. v. United

States, __ CIT __, 791 F. Supp. 2d 1327, 1333-34 (2011) (relying

on Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951)

("The substantiality of evidence must take into account whatever

in the record fairly detracts from its weight.")).

---

[21] ("In the absence of evidence in the record that the CBP data –
for merchandise entered during the relevant POR and subject to
the [antidumping] duty order at issue – are in some way
inaccurate or distortive, the agency reasonably concluded that
such data, collected in the regular course of business under
penalty of law for fraud and/or negligence, presents reliably
accurate information.  Because Customs officers have a duty to
assure the accuracy of information submitted to that agency by
penalizing negligent or fraudulent omissions and/or inaccurate
submissions, the presumption of regularity entails the
reasonable conclusion that, in the absence of evidence to the
contrary, the data obtained by Customs officials in their
regular course of business is accurate.") (citing, inter alia,
19 C.F.R. § 162.77(a) ("If the [appropriate Customs] Officer has
reasonable cause to believe that a violation of [19 U.S.C.
§ 1592 (prohibiting fraudulent and/or negligent submission
and/or omission of material information to Customs)] has
occurred ... he shall issue to the person concerned a notice of
his intent to issue a claim for a monetary penalty."); Seneca
Grape Juice Corp. v. United States, 71 Cust. Ct. 131, 142,
367 F. Supp. 1396, 1404 (1973) (noting "the general presumption
of regularity that attaches to all administrative action,"
namely that "[i]n the absence of clear evidence to the contrary,
the courts presume that public officers have properly discharged
their duties.  . . . [and] [t]his presumption, of course, also
attaches to the official actions taken by customs officers")
(additional citations omitted).

Here, Commerce acknowledged the Regal discrepancy but determined that this discrepancy did not impugn the accuracy of the *relative* (rather than exact) volumes of subject entries attributable to the respective respondents subject to this review. See I & D Mem. cmt. 8 at 42-45; see also Def.'s Br. at 17-18 ("Commerce reasonably explained in the final results that it does not require Type 03 CBP data to be flawless or free from discrepancies in order for it to be a reliable source for the limited purpose of identifying the largest exporters and producers during respondent selection.") (citing I & D Mem. cmt. 8 at 42-43).  The question before the court, therefore, is whether it was reasonable for the agency to conclude that Regal was one of the largest exporters/producers of subject merchandise during the POR, notwithstanding the Regal discrepancy.

Commerce's conclusion that Regal was one of the largest exporters/producers of subject merchandise during the POR, regardless of the 15-18 percent discrepancy between the sales reported in CBP data and those reported by Regal in response to Commerce's questionnaire, is reasonably supported by the evidence on record. See I & D Mem. cmt. 8 at 42-43 ("The [CBP] data are not used to *definitively* determine any particular respondent's actual quantity of subject merchandise shipped during the POR . . . [but rather are used solely as] a

reasonably accurate reflection of the relative position of the exporters under review") (emphasis in original); id. at 44 ("[T]he discrepancy between the CBP data and Regal's sales quantity would not have precluded [Commerce] from selecting Regal [as one of the largest exporters/producers of subject merchandise during the POR] . . . .").  Specifically, the record reveals that the magnitude of the Regal discrepancy is far outweighed by the magnitude of Regal's POR sales (with or without accounting for the discrepancy) relative to the remaining respondents.[22]  From this it is reasonable to conclude that the Regal discrepancy did not impugn the accuracy of Commerce's finding that Regal was one of the largest exporters/producers of subject merchandise during the POR. See I & D Mem. cmt. 8 at 44.

      *B.   Transshipment Allegations*

      AHSTAC also argues that the "indicia of transshipment" on this record "provide further 'new evidence'" that the CBP data used to determine respondents' relative POR sales volumes were unreliable for this purpose. AHSTAC's Br. at 27-28. Specifically, AHSTAC contends that "[t]he documented

---

[22] See Def.'s Br. at 4 ("If included in the CBP data, the discrepancy would have increased even further Regal's more than [[      ]] times greater volume of exports compared to those of the next largest exporter.") (citing Resp't Selection Mem. at Attach. 1).

transshipment through Cambodia to evade the [antidumping duty]
order on shrimp from China rebuts the presumption of reliability
ordinarily attaching to CBP data." Id. at 28.

But notwithstanding AHSTAC's characterization of the
record, the evidence does not indisputably "document[]
transshipment through Cambodia" during the POR.  On the
contrary, no imports of shrimp from Cambodia (potentially
transshipped or otherwise) during the POR are documented on the
record of this review.[23]  "In the absence of evidence in the
record that the CBP data – *for merchandise entered during the
relevant POR* and subject to the [antidumping] duty order at
issue – are in some way inaccurate or distortive, [Commerce may]
reasonably conclude[] that such data . . . present reliably
accurate information." Pakfood, __ CIT at __, 753 F. Supp. 2d
at 1345.  AHSTAC has not pointed to any record evidence that the
CBP data for subject merchandise entered during this POR
incorrectly reported any portion of the volume of merchandise
imported from China as originating in Cambodia. See AHSTAC's Br.

---

[23] See Certain Frozen Warmwater Shrimp from the [PRC], Customs
Data of U.S. Imports of Certain Frozen Warmwater Shrimp from
Cambodia, A-570-893, ARP 10-11 (May 17, 2012) at Attach. I,
reproduced in Def.'s App., Ct. No. 12-00289, ECF No. 58-6,
at Tab 32 (showing no imports of shrimp from Cambodia during the
POR); see also Final Results, 77 Fed. Reg. at 53,856 (noting
that the relevant POR was February 1, 2010, through January 31,
2011).

at 27-28.  Accordingly, AHSTAC's transshipment allegations are also insufficient to impugn the accuracy of the CBP data used to determine respondents' relative sales volumes in this review.

Commerce "enjoy[s] broad discretion in allocating [its] investigative and enforcement resources," Torrington, 68 F.3d at 1351, and the agency's finding that the two chosen mandatory respondents accounted for the "overwhelming majority of the total reported quantity of imports of subject merchandise to the United States during the POR," I & D Mem. cmt. 8 at 41, is supported by a reasonable reading of the record.[24]  No further showing is required. See 19 U.S.C. § 1677f-1(c)(2). Accordingly, Commerce's application of § 1677f-1(c)(2)(B) in this case is sustained.

III. Commerce's Calculation of Surrogate Labor Rates

A. Background

Because Commerce treats China as a non-market economy ("NME") country, Commerce determines the normal value of merchandise from China by using surrogate market economy data to calculate production costs and profit. See 19 U.S.C. § 1677b(c)(1).  In doing so, Commerce's valuation of the factors of production ("FOPs") must be "based on the best available

---

[24] See Resp't Selection Mem. at Attach. 1; see also supra note 17 and accompanying text.

information regarding the values of such factors in a market

economy country or countries considered to be appropriate by the

[agency]." Id.  "[T]o the extent possible," Commerce is required

to use data from countries that are both economically comparable

to the NME and significant producers of comparable merchandise.

Id. at § 1677b(c)(4).

        In the past, Commerce generally valued the labor FOP

for NME countries by using "regression-based wage rates

reflective of the observed relationship between wages and

national income in market economy countries." 19 C.F.R.

§ 351.408(c)(3) (2010).  Regression-based NME wage rates

estimated the linear relationship between yearly per capita

gross national income ("GNI") and hourly wage rate ("wage") to

arrive at the wage for an NME country by using the NME's GNI.[25]

But 19 C.F.R. § 351.408(c)(3) was invalidated as contrary to the

statute because, rather than evaluating the extent to which it

was possible to base surrogate FOP calculations on data from

countries that are economically comparable to the NME and

significant producers of comparable merchandise, the regulation

---

[25] Zhejiang DunAn Hetian Metal Co. v. United States, __ CIT __,
707 F. Supp. 2d 1355, 1366 (2010) (footnote omitted), vacated on
other grounds, 652 F.3d 1333 (Fed. Cir. 2011); see also Dorbest
Ltd. v. United States, 604 F.3d 1363, 1371 (Fed. Cir. 2010)
("Commerce determines a linear trend that best fits the data,
providing a way to predict the labor rate for a country with any
given gross national income.").

instead formulaically required reliance on data from countries

that did not satisfy one or both of these statutory

requirements.[26]

In response to Dorbest and Shandong, Commerce

reconsidered its approach to surrogate labor valuation,

including an opportunity for public comment.  The agency then

published its New Labor Rate Policy, explaining its change in

policy from a preference for using data from multiple market

economies when constructing surrogate labor rates to a policy of

relying on data from a single market economy to calculate all

surrogate FOPs, including labor.[27]  For its final results of this

review, Commerce employed the New Labor Rate Policy to arrive at

the surrogate wage rate used to construct normal value,

---

[26] See Dorbest, 604 F.3d at 1371-72 (holding that because the
statute requires Commerce to use data from economically
comparable countries "to the extent possible," Commerce may not
employ a methodology that requires using data from both
economically comparable and economically dissimilar countries,
in the absence of a showing "that using the data Congress has
directed Commerce to use is impossible"); Shandong Rongxin Imp.
& Exp. Co. v. United States, __ CIT __, 774 F. Supp. 2d 1307,
1316 (2011) (holding that because the statute requires Commerce
to use, "to the extent possible," data from countries that are
"significant" producers of comparable merchandise, Commerce may
not employ a methodology that requires using data from
"countries which almost certainly have no domestic production –
at least not any meaningful production, capable of having
influence or effect").

[27] Antidumping Methodologies in Proceedings Involving Non-Market
Economies: Valuing the Factor of Production: Labor, 76 Fed. Reg.
36,092 (Dep't Commerce June 21, 2011) ("New Labor Rate Policy").

see I & D Mem. cmt. 11 at 51-52, which AHSTAC now challenges.
See AHSTAC's Br. at 38-41.

Significantly, AHSTAC also challenged Commerce's
application of its New Labor Rate Policy in the fifth
administrative review of an antidumping duty order on certain
frozen warmwater shrimp from the Socialist Republic of Vietnam.[28]
In adjudicating that challenge, this Court sustained the New
Labor Rate Policy as reasonable on its face, holding that
"Commerce reasonably determined that, in general, the
administrative costs of engaging in a complex and lengthy
analysis of additional surrogate data for the labor FOP may
outweigh the accuracy-enhancing benefits of doing so."[29]  But
because the particular evidentiary record of that proceeding
included specific evidence that could fairly be read to detract
from Commerce's conclusion that its chosen primary surrogate
country provided the best available information regarding all
relevant FOPs (including labor), Commerce's application of its
New Labor Rate Policy in that proceeding was remanded for
Commerce to "to weigh and analyze the conflicting evidence and

---

[28] See Camau Frozen Seafood Processing Imp. Exp. Corp. v. United
States, __ CIT __, 880 F. Supp. 2d 1348 (2012) ("Camau I").

[29] Camau Frozen Seafood Processing Imp. Exp. Corp. v. United
States, __ CIT __, 968 F. Supp. 2d 1328, 1336 (2014)
("Camau III") (citing Camau I, __ CIT __, 880 F. Supp. 2d
at 1358).

provide a reasoned explanation for the outcome of such
weighing."[30]

   *B. Analysis*

        AHSTAC argues that Commerce's application of its <u>New
Labor Rate Policy</u> when calculating surrogate labor FOP values in
this review should be remanded on the same grounds as in <u>Camau</u>.
<u>See</u> AHSTAC's Br. at 39, 41.  But AHSTAC mischaracterizes the
holdings in <u>Camau</u>.[31]

        Generally, there is nothing inherently unreasonable in
Commerce's decision to value all surrogate FOPs (including
labor) using relevant data from a single surrogate country.
<u>Camau I</u>, __ CIT at __, 880 F. Supp. 2d at 1358; <u>Camau III</u>,
__ CIT at __, 968 F. Supp. 2d at 1336.  The necessity for remand
in <u>Camau</u> arose from the presence of specific record evidence –
stemming from the actual GNI disparity between the chosen
surrogate and the exporting NME – that fairly detracted from the

---

[30] <u>Id.</u>

[31] For example, AHSTAC contends that Commerce's determination in
the proceeding at issue in <u>Camau</u> was remanded to address prior
findings regarding "wage rate variability." AHSTAC Br. at 39.
But in fact the court upheld Commerce's <u>New Labor Rate Policy</u>,
which implements the agency's conclusion that the accuracy-
enhancing benefits of addressing wage rate variability among
economically comparable potential surrogates are generally
outweighed by the administrative costs of engaging in a complex
and lengthy analysis (as necessary to satisfy the statutory
criteria) of surrogate labor data from more than one country.
<u>See</u> <u>Camau I</u>, __ CIT __, 880 F. Supp. 2d at 1358;
<u>see also</u> <u>Camau III</u>, __ CIT at __, 968 F. Supp. 2d at 1336.

reasonableness of Commerce's data-set selection. See Camau III,

__ CIT at __, 968 F. Supp. 2d at 1336.[32]

Here, by contrast, AHSTAC does not point to any record

evidence specific to this review.  AHSTAC does not suggest that

the particular GNI difference between Thailand and China makes

the use of Thai labor data unreasonable for the purpose of

estimating fair market labor rates in China.  AHSTAC makes no

mention of any specific GNI values at all. See AHSTAC's Br.

at 38-41.  Instead, its challenge to Commerce's reliance on the

New Labor Rate Policy in this review is essentially a challenge

---

[32] The concern in Camau was that Commerce had initially chosen
Bangladesh as the primary surrogate for Vietnam *without
considering* the reasonableness of using Bangladeshi wage data as
a surrogate for Vietnam's labor rate (because Bangladesh was
chosen as the primary surrogate in that review at a time when
Commerce's policy was to use multiple countries' data to
calculate surrogate labor FOP values, before the New Labor Rate
Policy went into effect).  Indeed Commerce had even previously
specifically rejected the use of Bangladeshi wage data for this
purpose, based on the discrepancy in GNI between Bangladesh and
Vietnam. See Camau III, __ CIT at __, 968 F. Supp. 2d at 1332.
Then, applying the New Labor Rate Policy (which went into effect
in the interim between the preliminary and final results of the
proceeding at issue in Camau), Commerce did not in any way
reevaluate whether Bangladesh was still the best potential
surrogate from which to value *all* FOPs, including labor.  On the
contrary, Commerce did not even acknowledge that the record
contained conflicting evidence and findings in this regard,
including the agency's own prior finding that, due to the
particular GNI disparity between Bangladesh and Vietnam,
Bangladeshi wage data are likely to significantly understate the
estimated wage rate for Vietnam (given the generally linear
relationship between GNI and wage). See id. at 1334, 1336-38.

to the new policy generally, without regard to the specific

evidence on this record. See id.

        Specifically, AHSTAC argues that Commerce's reliance

on its New Labor Rate Policy in this review should be remanded

to account for Commerce's prior findings of a general

correlation between wage rate and GNI and the consequent wage

rate variability among countries with GNIs that Commerce treats

as economically comparable. See id. at 39.  But these are

findings of a general nature, whose impact was already

considered and weighed by Commerce in the context of reasoning

through its New Labor Rate Policy.[33]  In Camau, it was

additionally argued that the record evidence indicated that the

specific GNI difference between Bangladesh and Vietnam was

sufficiently great as to significantly understate the estimated

labor FOP, a factor which Commerce had failed to consider and

weigh against the remaining evidence suggesting that

Bangladesh's data as a whole were the best available on record

from which to value all of the surrogate FOPs, all things

considered.[34]

_____

[33] See New Labor Rate Policy, 76 Fed. Reg. at 36,093; Camau III,
__ CIT at __, 968 F. Supp. 2d at 1336.

[34] Thus the remand in Camau was so that Commerce may explicitly
engage in such weighing of the specific evidence on the record
of that proceeding, *not* because Commerce was required to
reevaluate the *general* conclusions underlying its new policy
                                        (footnote continued)

Because AHSTAC makes no arguments specific to the
evidence on the record of this review, its challenge is
essentially a renewed facial challenge to Commerce's New Labor
Rate Policy. See AHSTAC's Br. at 39-41.  But as AHSTAC presents
no new arguments in this respect, the reasonableness of
Commerce's New Labor Rate Policy is sustained on the same
grounds as stated in Camau I and Camau III. See Camau I,
__ CIT at __, 880 F. Supp. 2d at 1358; Camau III, __ CIT at __,
968 F. Supp. 2d at 1336.

## CONCLUSION

For all of the foregoing reasons, Commerce's Final
Results are sustained against the challenges presented in this
action.  Judgment will issue accordingly.


                                    /s/ Donald C. Pogue
                                 Donald C. Pogue, Chief Judge

Dated: May 27, 2014
       New York, NY

---

(which include the conclusion that "in general, the
administrative costs of engaging in a complex and lengthy
analysis of additional surrogate data for the labor FOP may
outweigh the accuracy-enhancing benefits of doing so").
Camau III, __ CIT at __, 968 F. Supp. 2d at 1336.